**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**
Plaintiff,

v.

**E.J. SACCO, INC., Defendant.**

**No. 98–CV–75627–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 31, 1999.

Ellen G. Ha, Adele Rapport, Equal Employment Opportunity Commission, Detroit, MI, for plaintiff.

Robert M. Vercruysee, Vercruysee, Metz & Murray, Bingham Farms, MI, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CLELAND, District Judge.

### I. Introduction

This matter is before the court on defendant E.J. Sacco's ("Sacco" or "defendant") motion for summary judgment, filed on March 22, 1999. Plaintiff Equal Opportunity Employment Commission (the "Commission" or "plaintiff") filed a response on April 20, 1999, and defendant replied. A hearing was held on May 26.

The case arises from the discovery of an attempted theft of money from the Mt. Pleasant, Michigan, Burger King cash drawers in the very busy hours preceding Halloween night; resulting from the discovery were certain adverse job actions: the temporary suspension of one employee and the termination of another. Erica Galloway and Jennifer Thomas were the affected workers, and although neither was ever finally charged in the attempted theft of nearly $200, both were particularly well-positioned to have been involved and Galloway especially was reported to have acted in a suspicious and improper manner that evening. The instant suit was filed following a lengthy EEOC investigation, and claimed that racial discrimination, not employee misbehavior, motivated the defendant to 1) falsely accuse Galloway and Thomas of theft, and 2) discharge Galloway and Thomas from employment. In its response to Sacco's motion, however, the Commission now concedes what it apparently had not discovered during its own comprehensive investigation: 1) defendant, in fact, had never accused either Galloway or Thomas of theft, and 2) Thomas, in fact, was never discharged. The case would appear, then, to have been reduced to a claim of wrongful termination of Galloway. The parties, however, treat the matter as though the complaint had been amended to claim a racially discriminatory suspension of Thomas. Further, the Commission argues here that various other acts of the defendant were racially discriminatory, numbering among those "acts" the suspicions allegedly harbored by defendant's managers.

Finding that no facts support the Commission's suit, the court grants the Sacco's motion to end this baseless litigation.

### II. Facts

The following facts are undisputed. October 31, 1997, was an extremely busy business day for the Burger King in Mt. Pleasant. The drive-thru cashier on shift at the time was Maria Chambers, and her shift ended at 4:00 p.m.; however, the manager, Deborah Peters, asked Chambers to work overtime due to the volume of customers at the drive-thru. When the rush ended, around 4:20 p.m., Manager Peters told Chambers that she could leave; in view of the extra time Chambers had put in, Peters volunteered to count Chambers' till herself, and Chambers agreed. Although it was company policy for a departing cashier to count her own till in and out, Peters put the till in the safe and counted it about forty-five minutes later only to discover that nearly $200 was missing. Peters then followed company procedures regarding attempts to account for a till shortage, but when the missing money

could not be located she called the district manager, Jeffrey Johnson.

Johnson asked that the "cash handling procedures" be followed once more, but that if the money remained unaccounted for, other tills should be examined at the end of the night. Peters told her assistant managers to watch for the possibility that money missing from the Chambers till would be located in another cashier's till at the end of the night and Peters left the restaurant. At this point, defendant believed the missing money was the result of a mere clerical error and did not suspect any criminality.

At 7:00 p.m. that night, Peters had arrived at her home, and received a disturbing phone call from her assistant manager on duty, Rebecca Langlois. The assistant explained that a drive-thru cashier, Sarah Brown, had just reported seeing another employee, Erica Galloway, going into Brown's drive-thru cash till without authorization.[1] Peters immediately relayed this information to district manager Johnson, who directed that Langlois should close the drive-thru cash till and put it in the safe. Johnson also instructed her to assign a new till to the drive-thru cashier, call the police, and retain all the employees in the restaurant until he could arrive.

The Mt. Pleasant Police Department was called, and Sergeant Shell soon arrived at Burger King to investigate. Shell spoke to the assistant managers on duty (including Langlois) and worked with management to create a list of employees who were working between 2:30 and 4:00 p.m. and were thus potential suspects. Shell then began to interview those employees who were at the restaurant. While the interviews were being conducted, Peters located a bag near the "expediting printer;" looking into the bag, she discovered that it contained $160, nearly the amount

missing from earlier in the day. Peters quickly notified Sergeant Shell.

Shell asked which employees worked in which areas of the restaurant, and Peters supplied that information; she explained that Erica Galloway and Jennifer Thomas were the two employees assigned to the "expediting" area where the bag of money was found. Shell determined that Galloway and Thomas were key suspects since they were working during the time in which the Chambers shortage occurred, they were both assigned to work in the area where the money was later found, and Galloway was reported to have had her hand in another drive-thru cashier's till without authorization. Galloway and Thomas volunteered to go to the police station that night with Shell to be fingerprinted.

Detective Tuma conducted a follow-up investigation later by speaking with Chambers and Peters. Peters suggested that all eleven (11) employees working from 2:30 til 4:00 p.m. the day in question should be fingerprinted. Tuma asked Peters to narrow the list, which she did by suggesting Chambers, Galloway, and Thomas. Tuma did not fingerprint Chambers, reasoning that her prints would be explainable since she had received the money originally from customers; the other two had already been printed. Tuma then determined that obtaining prints from additional employees would be uncalled-for since the money had been found and it was "not the most serious of crimes."

Johnson and Peters determined after the incident that Galloway's employment should be terminated for violating Burger King's cash policy which prohibits going into another employee's cash drawer without authorization. Johnson also decided to suspend Thomas pending the results of the police investigation. However, after two

---

1. Variously expressed as having her hand "in the till," having her hand "coming out of the till," etc. Galloway's own recollection was more specific than anyone else's: she said she heard Brown tell another employee that Galloway's hand had come out of the till and gone into her pocket (Galloway deposition, p. 88.) No money was apparently missing from Brown's till, however.

weeks without resolution of the investigation, Johnson determined that Thomas could return to work. He instructed Peters to tell Thomas, when she came in to pick up her pay check, that she could return to work. Thomas, however, never returned to work. The police investigation was later concluded and the case closed with no arrests being made. Galloway and Thomas are both African–American.

Thomas and Galloway filed charges of racial discrimination with the EEOC and Michigan Department of Civil Rights alleging that defendant (1) falsely accused them of theft because of their race and (2) discharged them because of their race. The EEOC brought this complaint, and upon the close of discovery, defendant moves for summary judgment.

### III. Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.

The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which the non-moving party would bear the ultimate burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. But the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim. *Id.* at 323, 106 S.Ct. 2548. Once the moving party meets this burden, the burden passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element necessary to his or her case with respect to which he or she bears the burden of proof. *Id.* at 323, 106 S.Ct. 2548. The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor, *Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir. 1989), *i.e.,* that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant. *Id.* at 1476. The non-moving party must present affirmative evidence on critical issues. *Id.* at 1477.

### IV. Discussion

#### A. The Parties' Positions

The Commission argues that Galloway and Thomas, as members of a protected class, were treated differently than similarly-situated but non-protected employees. (Pl.Br. at 7.) The actual claims of the Commission's complaint, as noted above, have been largely abandoned: it is clear that neither employee was accused by Sacco of theft and that only Galloway was fired. The Commission now focuses chiefly on the defendant's mental processes, and asserts that the $200 shortage in Chambers' till was presumed by defendant to be a "clerical error" only until Brown accused Galloway of having her hand in the drive-thru cash till, which, in the mind of defendant, transformed an "error" into a suspected theft. This happened, the Commission asserts, not because of the sequence of events, but solely because of Galloway's race. Additionally, the Commission claims, defendant's crediting Brown's accusation and disbelieving Galloway's denial was based solely on Gallo-

way's race. (*Id.* at 8.) The Commission casts as "misleading" defendant's position that Galloway and Thomas were suspects chiefly because they worked as food expediters; every employee had access to the expediting area of the front counter, the Commission notes.

The Commission posits these four questions as "concerning" genuine issues of material fact that should preclude the granting of summary judgment: (1) was Galloway subjected to disparate treatment on the basis of race when she was suspected of embezzlement? (2) Were Galloway and Thomas subjected to disparate treatment on the basis of race when defendant provided misleading information to the police? (3) Were Galloway and Thomas subjected to disparate treatment on the basis of race when Galloway was terminated and Thomas was suspended while similarly-situated non-minority employees were not disciplined? (4) Were defendant's articulated reasons for Galloway's termination and Thomas' suspension legitimate and nondiscriminatory? (*Id.* at 6.) The court discerns from the presentation of these questions that the Commission intends to proffer four basic purported facts: (1) the defendant's suspicions about Galloway; the Commission casts them as discriminatory; (2) the defendant providing information to the police; the Commission casts it as "misleading" and discriminatory; (3) that similarly-situated non-minority employees remained undisciplined; and (4) that defendant's articulated reasons for the termination and suspension are pretextual.

Defendant argues that it cannot be liable for the actions of the police taken during the investigation. Defendant asserts that it merely called the police to report the missing money and provided information to the police concerning Brown's report of Galloway's hand in or suspiciously near her cash till, the missing money, where the bag of money was found, and who was working in which areas of the restaurant. (Def.Br. at 13–14.) The investigation by the police did not simply target Galloway

and Thomas, defendant notes, because seven employees were questioned by the police when the police arrived at the restaurant, because Chambers was interviewed thereafter, and because another African-American employee was not deemed a suspect. (*Id.* at 16.) Additionally, Galloway and Thomas volunteered to be fingerprinted, defendant asserts, and it is not contested that once defendant learned that the police had printed two employees, it asked that all employees working at the time be fingerprinted. (*Id.* at 16–17.)

Defendant further argues that summary judgment is proper because the Commission cannot show that the reason for Galloway's termination was racial discrimination rather than the legitimate, non-discriminatory reason of violation of company cash policy. Similarly, defendant asserts that the Commission cannot show that the decision to suspend Thomas was not based on the legitimate, non-discriminatory belief that Thomas was suspected by the police of having taken the money.

### B. Analysis

#### 1. Prima Facie Case

Defendant is prohibited from "discharging any individual, or otherwise ... discriminating against any individual with respect to compensation ... because of such individual's ... race." 42 U.S.C. § 2000e–2(a)(1). A plaintiff can avoid summary judgment if it shows either that race directly played a role in the employment decision or that discrimination can be inferred from the evidence presented. *See Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 252–53 (6th Cir.1998). Plaintiff carries the initial burden of proof by a preponderance of the evidence. *See Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

There are four elements for establishing a prima facie case of disparate treatment as asserted in this matter: it must be shown that (1) a member of a protected class (2) suffered an adverse em-

ployment action (3) while qualified for the position, but (4) was treated differently from similarly-situated employees. *See id.* at 253, 101 S.Ct. 1089; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992). The first three elements are not challenged in this motion, and the court will presume that the Commission has met the burden in those respects.

"It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of a non-minority employee's, the plaintiff must show that the 'comparables' are similarly-situated in *all* respects." *Mitchell*, 964 F.2d at 583.

[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.* "[S]imilarly-situated employees must simply have been engaged in misconduct of comparable seriousness." *See Harrison v. Metropolitan Gov't of Nashville & Davidson County*, 80 F.3d 1107, 1115 (6th Cir.), *cert. denied*, 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996); *see also Hollins v. Atlantic Co. et al.*, 188 F.3d 652, 662–63 (6th Cir.1999). The Sixth Circuit has subsequently cautioned, however, that this language from *Mitchell* should not be "exceedingly narrowly construed" or applied; the inquiry should focus on whether "all of the *relevant* aspects of [a minority worker's] employment situation [are] 'nearly identical' to those of the non-minority's employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998) (emphasis original) (quoting, in part, *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). The court must make an independent determination on the *"relevant* aspects" of the employment situation and not

be limited by the factors announced in *Mitchell. Id.*

The question presented in this motion, then, is whether there is any evidence showing, either by direct or inferential evidence, that Galloway or Thomas was treated differently from similarly-situated but non-protected employees.

The undisputed evidence that has been presented establishes only that defendant called the police to investigate missing money; that defendant cooperated with the police investigation; that, after considering the circumstances, defendant terminated Galloway's employment for violating the company cash handling policy; and that Thomas was suspended pending the police investigation but later asked to return to work. The Commission has produced no evidence of any kind that similarly-situated employees were treated differently than were Galloway and Thomas. Thus, the Commission has not established a prima facie case of discrimination. No material issues of fact exist which prevent the granting of summary judgment.

First, the Commission has produced no evidence that could establish that a non-protected employee suffered less than job termination for misbehavior comparable in seriousness to being seen with one's hand in (or suspiciously near) another cashier's till *under these circumstances*, as was Galloway. Neither has the Commission produced any evidence that could establish that a non-protected employee was not at least suspended pending further investigation of misbehavior comparable in seriousness to a suspected theft *under these circumstances*, as was Thomas. The court emphasizes "under these circumstances" because the surrounding events and conditions are important in the court's determination of the "relevant aspects" of the employment situation that must be nearly identical for two employees to be deemed similarly-situated. *See Ercegovich* 154 F.3d at 352. The circumstances in this case demonstrate much more than a mere unsubstantiated report by one employee

against another; defendant's suspicion of misconduct was made against a tapestry of other credible, objective information known to the defendant.[2]

The court is not persuaded by the Commission's argument that it was illegitimate for defendant to credit Brown's report concerning Galloway's behavior and correspondingly disbelieve Galloway's denial of wrongdoing. First, the Commission has produced no evidence that indicates, or even from which it can be inferred, that racial animus or another improper motivation propelled defendant's decision to credit one employee over the other employee's protestation. The Commission has done nothing more than point out the racial difference between Erica Galloway (who is black) and Sarah Brown (who is not) and baldly assert that this distinction motivated defendant.

Second, there are objective and undisputed facts that would support defendant's decision to credit Brown's report and disbelieve Galloway's denial. Brown reported Galloway's behavior only a few hours after Peters discovered Chambers' till was $200 short; no other employees, except management, knew that $200 was missing from the afternoon drive-thru till at the time Brown reported Galloway's behavior at the drive-thru till; there was no work related reason for Galloway to be near Brown's till in the drive-thru area; defendant knew that Galloway was working during the time period when the $200 was taken from the drive-thru cash till; and, of great significance, a bag containing close to the amount missing from Chambers' till was located, hidden in the area to which Galloway and Thomas were assigned to work.[3]

The Commission has failed to point out evidence that shows how either Galloway or Thomas are similarly situated "in all relevant respects" to *any* non-discharged or non-suspended employee. The Commission might be correct that Galloway is not the only employee who violated one of Burger King's cash handling policies,[4] but even if this were true, it is not the case that every violation of a company policy must be accorded equal weight. Employees are not "similarly situated" unless their actions (i.e., their misbehaviors) are *proven* to be of "comparable seriousness." *See Mitchell,* 964 F.2d at 583. In *Mitchell,* for example, the plaintiff asserted that acts of insubordination (cursing) and absenteeism were "of comparable seriousness" to Mitchell's concealment of records and lying when confronted by her supervisor. *Id.* Mitchell failed to produce facts that could prove her assertions, however. The Sixth Circuit said, "plaintiff's allegations regarding other employees not being fired for different, but what she subjectively believes to be more serious, misconduct simply does not satisfy [the second element that plaintiff was treated differently from similarly situated non-minority employees]." *Id.*

**2.** All of that information was clearly explained by the defendant to the EEOC very early in the administrative process, the court notes.

**3.** The Commission's argument that other employees had *access* to the expediting area where the bag of money was found does not diminish the impact of the fact that the expediting area was where Galloway and Thomas were assigned to work their shift on the day in question. It was in no way improper for defendant to consider this fact among all the other facts.

**4.** The conclusion of multiple policy violations by other employees requires considerable stretching and twisting, *see* text at pages 17–18, *infra.* This court does not comprehend how Brown, for example, could be guilty of violating the company cash handling policy which prohibits employees from allowing anyone to go into their cash till. Brown merely used a defective machine that management knew did not shut properly. The Commission appears to be arguing that Brown violated the cash handling policy by permitting the *possibility* that someone may go into her cash till if she left her register knowing the cash draw would not secure. As the court stated at argument, this seems quite the fanciful interpretation. Nonetheless, if a conclusion can be found somewhere within the evidence or reasonable inferences from it, such a conclusion must be indulged in favor of the non-moving party.

Here, the Commission has asserted that experiencing a shortage in one's cash till or leaving work without counting one's cash till—as Chambers did—or leaving one's cash till unattended knowing the drawer was unlatched—as Brown apparently did—or directing an employee to leave without counting her till—as Peters did—each is at least a nominal violation of company policy. These the court will accept as correct interpretations of the policies, see footnote 3, *supra*. The Commission further argues by implication that each of these violations has importance under the company policy equivalent to invading the cash till of another employee, but such assertions of equivalent importance remain unsupported. The Commission has produced no evidence that could establish that these examples of misbehavior have anything like equal significance to the misbehavior attributed to Galloway. *See Mitchell*, 964 F.2d at 583; *cf. Hollins*, 188 F.3d at 662–63.

First, it has now become clear that the shortage in Chambers' till resulted from someone *stealing* money later to be found under the expediting counter. It is true that Chambers left without counting her till, but she was *instructed* by her supervisor to do so.[5] Next, Brown was *assigned* to work a defective register, and the management knew the drawer would not latch. Nothing remotely reminiscent of these characteristics is found either in the Galloway or in the Thomas situation. Finally, Peters is a *manager* with different responsibilities and supervisors and is in no way comparable to Galloway. The Commission has thus failed to establish the existence of any other similarly-situated, but non-terminated or non-suspended, employee.

The Commission claims also that defendant "misled" the police during the investigation in a racially-biased manner. This statement is repeated at least four times in the Commission's brief and was asserted at oral argument. However, the Commission produces no evidence that establishes this allegation. The nearest approach the Commission makes to putting forth a "misleading fact" is defendant's recitation to the police of the number of employees who had access to the expediting area. (Pl.Br. at 9.) The Commission claims as follows: when the police asked defendant who worked the expediting counter, the defendant identified Galloway and Thomas (the accuracy of that statement is not disputed); other employees worked nearby and had access to this area, but were not identified by defendant as working at the expediting counter. The Commission therefore firstly asserts that because defendant did not include in its response to the police inquiry the other employees who had access to the expediting counter, defendant provided "misleading" information to the police.

The Commission secondly points to the testimony of Jeffrey Johnson explaining to the EEOC investigators the several reasons that defendant decided to suspend Thomas. On the strength of Johnson's statements to the EEOC (in a February, 1998 letter and in his January, 1999 deposition, both much later than the police investigation), the Commission argues that defendant "provided misleading and racially biased information to the police." (Pl. Br. at 10.)

The undisputed facts show that defendant did nothing more than cooperate with the police, providing truthfully the information requested concerning, among other

5. The Commission's attorney presented the following reasoning at the hearing: 1) defendant's treatment of Galloway was racially biased because it was different from defendant's treatment of Chambers, who left by permission without counting out her till; 2) Chambers' permitted conduct was *mis*conduct equivalent to Galloway's hand-in-the-till (and Chambers was thus similarly-situated) because the permission Chambers received was itself racially biased; 3) the permission was racially biased because it allowed Chambers and Galloway to be treated differently. More than circular logic is required to establish that employees are "similarly situated" under *Mitchell*.

things, the employees on duty and their respective work stations during the time of the suspected theft. Providing truthful information to the police is not improper. It is, in fact, a civic duty to cooperate with a police investigation. *See Detroit Police Officers' Assoc. v. Young,* 608 ·F.2d 671, 695 (6th Cir.1979) (stating that "the relationship between government and citizens is seldom more visible, personal and important than in police-citizen contact. . . . It is critical to effective law enforcement that police receive public cooperation and support") (citations omitted).

For the defendant's manager to not mention to the police investigator on the scene that all employees had access to a food preparation counter in this fast-food restaurant is not equivalent to "providing misleading information." The court presumes that the investigating officer could see and was capable of looking around the restaurant as he investigated. A failure by the defendant to state what is observable or obvious simply is not the same as "misleading" the police.

The second allegation of defendant's supposedly misleading behavior, based on the Johnson statements, makes no sense at all; Johnson's statements in the letter and the deposition occurred long after the fact and the Commission does not even now allege that Johnson communicated any of this "misleading" information to the police investigators.

The EEOC attorneys responsible for this file [6] have repeatedly presented arguments and suggestions in this vein and others that are themselves, at best, mis-

leading and disingenuous; such arguments, seen in the worst light, are simply disreputable. In sum, the record supports only a conclusion that the police conducted an independent evaluation informed by defendant's statements, but not "misled" in any way.

The Commission also challenges the fact that defendant avoided suspecting Chambers of misconduct and did not terminate Chambers for the shortage in her till. But, given the facts known to defendant it was nothing less than reasonable to not suspect Chambers of misbehavior. First, Chambers had already left at 4:00 p.m. for the weekend, while the stolen money remained hidden in the bag, inside the restaurant. Second, Chambers readily agreed to her manager's suggestion that the manager count the till for her in Chambers' absence. The Commission assumes an astounding degree of stupidity employed by Chambers as it suggests that she might steal money from her own till, hide it in the store and then invite her manager to count the resulting balance; there is no evidence in the record to support such a wild idea. The defendant could reasonably conclude from the facts known to it that someone other than Chambers was attempting to steal the money missing from Chambers' till. "Racially discriminatory suspicion" is not made out.[7]

On the other hand, Galloway and Thomas were suspected within reason by both the police and the defendant because they worked in the "expediting" area where the money bag was ultimately found and be-

---

6. Five attorneys are named on the briefs: Stewart, Reams, Rapport, Ingram and Ha; Ha signed the brief and presented oral argument.

7. The Commission took one other flailing stab at a disparate treatment argument. It does not deserve discussion in the text of this opinion, but the court cannot let it pass altogether. The Commission argued in its brief that not only had Brown suffered no job detriment for the offense of "allowing" Galloway to invade her cash drawer, but the defendant actually

rewarded the report of Galloway's behavior with a "thank you" note and "free milk shakes for a week." The court wishes to inform counsel that not everything the client *says* is required to be passed along in briefs. In any event, it is patently foolish to suggest, as the Commission does, that Sacco's policy mandates the termination of Chambers, an employee reasonably thought by Sacco to be the victim of another's misbehavior, because of the results of that victimization.

cause Galloway was later reported in Brown's till without authorization.

The court finds that the Commission has not satisfied the fourth element, i.e. that Galloway and Thomas were treated differently than any similarly-situated employees. Thus, the Commission has failed to establish a prima facie case of race discrimination.

### 2. Pretext

Even assuming, *arguendo*, that the Commission could establish a prima facie case of discrimination, and thus shift the burden to defendant, within the facts already thoroughly discussed the defendant has come forward with substantial and legitimate non-discriminatory reasons for its adverse employment actions.

Both Peters and Johnson testified in their depositions that Galloway was terminated for violating the company cash policy by being in another employee's cash till. (*See* Def.Ex. A at 81; Ex. B; Ex. D at 132; and Ex. L.) Peters and Johnson also testified that Thomas was suspended because the missing money was found near her work area and because she acted nervous during the police questioning and investigation. (Def.Ex. A at 81; Def.Ex. D at 117–19; Pl.Ex. 15.) The Commission now concedes that Thomas was asked to return to work but never did. In addition, it is not disputed that defendant believed at the time that the police had sufficient information to connect both Galloway and Thomas to the attempted theft because they were the only employees who went to the police station for fingerprinting.

■ The Commission asserts that, because Galloway denies that she was in or near Brown's cash till, there remains a genuine issue of material fact—that the truth or falsity of Galloway's denial must be established at trial. But, as an at-will employee Galloway was not entitled to a trial (or even due process) before termination. *See Manning v. Hazel Park*, 202 Mich.App. 685, 694, 509 N.W.2d 874, 878–79 (1993); *MERC v. Reeths–Puffer Sch.*

*Dist.*, 391 Mich. 253, 259, 215 N.W.2d 672 (1974) (holding that an at-will employee can be fired for a "good reason, bad reason, or no reason at all"). In this race discrimination case, whether Galloway did in fact have her hand in the till of another cashier is not a material fact that must be submitted to a jury. What is required of an employer is not perfection, but that it make a "reasonably informed and considered decision before taking an adverse employment action." *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir.1998).

Defendant having articulated legitimate, non-discriminatory reasons for its actions concerning Galloway and Thomas, the burden shifts back to plaintiff, who must establish that the proffered reasons are a mere pretext for racial discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508–09, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Mitchell*, 964 F.2d at 584. Plaintiff may prove pretext " 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *St. Mary's Honor Ctr.*, 509 U.S. at 517, 113 S.Ct. 2742 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). " 'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* at 507, 113 S.Ct. 2742 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). Significantly, a "plaintiff's denial of the defendant's articulated reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment." *Mitchell*, 964 F.2d at 585.

The Commission has not produced any evidence that shows, or from which it could be inferred, that discrimination was the real reason for defendant's decision to terminate Galloway and suspend Thomas. The Commission repeatedly points to Gal-

loway's bare denial of wrongdoing coupled with the racial difference among the various employees. Such assertions, standing alone, are grossly insufficient. *See Mitchell,* 964 F.2d at 584. The defendant's explanation is proffered against a background of objective factual information. There is nothing about it that has been shown to be inherently suspicious, plainly illogical, in any way inconsistent with actual practice, or for any other reason unworthy of credence on its face. *See Smith,* 155 F.3d at 807–08; *cf. Mitchell,* 964 F.2d at 587 (Jones, J., dissenting). In essence, Galloway was reported by another employee to have violated cash policy at a time and under circumstances that gave great weight to the report. Thomas was investigated for involvement in theft under those same conditions. That Galloway denies the violation is noted, but her denial not enough to show that race probably motivated the termination.

### V. Conclusion

The Commission has spoken of an injustice done to Galloway and Thomas, and has urged upon this court that the "subtlety" of defendant's discrimination "should not be excused" or allowed to be "covered up under the pretext of 'legitimate business reasons.'" (Pl.Br. at 1, 18). The subtlety perceived by the Commission must be profound indeed; from the facts presented in this case, racial discrimination is utterly undetectable. It seems far more likely from the known facts that any injustice has been done to the reputation and treasury of the defendant, targeted for expensive litigation by an agency of the government proceeding blindly along its path with no evidence in hand.

IT IS ORDERED that defendant E.J. Sacco's motion for summary judgment is GRANTED. Defendant's concurrent motion for sanctions remains pending.