**Eunice HOLLINS, Plaintiff–Appellant,**

v.

**ATLANTIC COMPANY, INC.; Swagelok Company; Crawford Fitting Company; John Doe Companies, 1–100, Defendants–Appellees.**

No. 98–3028.

United States Court of Appeals,
Sixth Circuit.

Argued: March 17, 1999

Decided and Filed: Aug. 13, 1999

---

Bruce C. Allen (argued and briefed), Blair Hodgman (briefed), Allen & Hodgman, Cleveland, Ohio, for Plaintiff–Appellant.

John F. Burke III (argued and briefed), Jeffrey M. Embleton (briefed), Mansour, Gavin, Gerlack & Manos, Cleveland, Ohio, for Defendants–Appellees.

Before: RYAN, NORRIS, and COLE, Circuit Judges.

**OPINION**

RYAN, Circuit Judge.

This is a case in which an employer's supervisors undertook to evaluate the suitability of a female employee's hairstyle and, not surprisingly, got in over their heads. Eunice Hollins, an African–American, sued her employer, and its associated companies, collectively hereinafter "Atlantic," alleging unlawful disparate treatment on the basis of race under 42 U.S.C. § 1981, 42 U.S.C. §§ 2000e–2000e–17, and OHIO REV.CODE § 4112.99, in the application of Atlantic's personal grooming standards to Hollins's hairstyle preferences. Hollins also alleged unlawful retaliation under 42 U.S.C. § 2000e–3(a) for her filing a disparate treatment claim with the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity Commission (EEOC). The district court held that Hollins failed to make out a *prima facie* case on either theory and entered summary judgment for Atlantic.

We reverse the district court's decision as to the disparate treatment claim, affirm as to the retaliation claim, and remand the case for further proceedings.

**I.**

Atlantic Company, Inc. is a manufacturing company in Willoughby Hills, Ohio, where Hollins has worked as a machine operator since July 25, 1994. Atlantic's grooming policy states in relevant part:

> Women should have a neat and well groomed hair style. Rollers and other hair setting aids are not permitted. For safety, women may be required to have their hair tied back.

Another section of Atlantic's policy manual describes Atlantic's personal appearance policies more generally:

> When it comes to your appearance as part of our Company, there are certain standards important to our operation which you must follow. We don't ask just some of our people to follow these standards, but that everyone follow them.

On August 17, 1994, Hollins arrived at work with her hair styled in a fashion known as "finger waves." The foreman, Joseph Konopinski, informed Hollins that her style was unacceptable to the company because it was "too different" and did not meet company policy. Konopinski later testified that by his standards and those of the company, the style was neat and well groomed, and safe, but that it was also "eye catching."

The next day Hollins appeared at work with the same hairstyle. Randall Adams, the plant supervisor, informed her that the style was unacceptable and did not meet company guidelines or policy. Adams told Hollins that if she did not like the policy, she should not work at Atlantic. A plant manager, Bhushan Shendure, thought the hairstyle was "eye catching" and, therefore, inappropriate. Hollins subsequently changed her hair to a plain style that she did not prefer.

In the fall of 1994, Shendure informed Hollins that she should seek advance approval for her hairstyles, and suggested that she present to her supervisor pictures of any styles she might wish to try. Shortly thereafter, Hollins presented Adams with a picture of a braided style she wanted to wear. Adams rejected the style as unacceptable.

In the winter of 1995, A.T. Patil replaced Shendure. Hollins and a coworker, Vanessa Toney, who is the only other non-supervisory African–American woman who works on the same shift as Hollins, asked Patil what hairstyles would be acceptable; Patil told them to present pictures for advance approval. A few days later Hollins and Ann Peters, Hollins's immediate supervisor on the plant floor, who is also an African–American, presented pictures to Patil. Patil and Adams approved some finger wave and braided styles, but cautioned Hollins that if she wanted to change to another hairstyle she must present pictures for pre-approval.

In January or February of 1996, Hollins arrived at work one day with her hair pulled back in a "ponytail." Five white women on her shift working under the same supervisors wore the same style on many occasions. Adams informed Hollins that the new style was "too drastic" and reminded her that she had been instructed to ask about new styles before changing. Adams also stated that Hollins's failure to stay within the guidelines could hurt their working relationship, and if that should happen she would not have reason to be working at Atlantic. She went back to her old style. At the end of February 1996, she received her regular performance review and Konopinski informed her that failure to wear a "correct" hairstyle would affect future reviews.

A month or so later, Hollins reported to work one day wearing a braided style previously approved by Patil and Adams. Konopinski informed Hollins that he wished she had let management know in advance when she was going to change her style, although he acknowledged that the style had been approved previously. In the Spring of 1996, Hollins presented pictures of two braided styles to Adams, and he approved them provided they were within the safety guidelines. Adams also informed her that she was free to change her hairstyle within the group of previously approved styles without asking in advance. However, changing to a different, unapproved hairstyle might require an immediate change, and Hollins would lose any "investment" she made.

At Hollins's regular performance review on June 26, 1996, Konopinski reminded her of her obligations to wear a correct hairstyle and to continue complying with her agreement with Adams. On June 27, 1996, Hollins filed complaints with the OCRC and the EEOC, alleging that she had been subject to racial discrimination in the application of the appearance and grooming standards.

In July 1996, Adams told Hollins that he was upset with her for filing the complaints with the OCRC and the EEOC. He told her that he never said she could not wear a ponytail. She subsequently wore a ponytail on several occasions without being told it was unacceptable.

In late 1996, Michael Gagel replaced Konopinski as Hollins's foreman. On January 20, 1997, Hollins wore the ponytail style previously approved by Adams. According to Gagel, the style was neat, well groomed, and did not present a safety risk; but, it immediately caught his attention because he was aware of Hollins's civil rights claims and as a supervisor was concerned about the hairstyle. Gagel met with Adams, Ann Peters, and two department supervisors, Larry Ault and Tony Kaylor. The group discussed Hollins's hairstyle, and the "intent" of the grooming standards. Gagel testified that they agreed that the "grooming standards are such that an [employee's] hair should not in itself call attention to [the employee]."

As a result of the meeting, Gagel met with Hollins and informed her that the ponytail hairstyle was unacceptable because it was more than two to three inches above her head and called attention to her. Gagel also informed her that he had reviewed her file and was aware of her consistent "challenge[s]" to the boundaries of the policy and the OCRC/EEOC claims. He viewed her changing hairstyles and her civil rights claims as challenges to the company's grooming policy.

Gagel told Hollins that her challenges to the policy could result in termination or transfer, and could affect future wage increases. He also stated:

> If your hair is that important to you, you may want to consider if you want to continue working for this company or if you would rather find employment at a company where you can style your hair however you want.

Hollins understood these comments to mean that she would be terminated if she violated the policy in the future.

Shortly thereafter, at her regular four-month performance review, Gagel lowered Hollins's ratings from (5) "Very Good" to (4) "Good" for personal appearance and cooperativeness. However, her overall review ratings as of February 27, 1997 resulted in a $.50/hour raise effective February 24, 1997. In June 1997, she received still higher ratings and received a $.70/hour raise.

Hollins filed her complaint in the district court on January 24, 1997, before the conclusion of the EEOC administrative investigation. The EEOC issued a right to sue letter on April 15, 1997, and Hollins amended her complaint to include a claim under Title VII. Atlantic filed a motion for summary judgment on August 8, 1997, arguing that Hollins had failed to make out a *prima facie* case on both the disparate treatment claim and the retaliation claim. Atlantic argued further, that assuming *arguendo* that Hollins made out a *prima facie* case of disparate treatment, she would ultimately be unable to prove application of the policy in a discriminatory manner because she presented no probative evidence that the grooming policy was applied differently to white people than to African–American people. In opposition to the motion Hollins relied on her affidavit and Toney's affidavit, both of which allege that white women who wore identical or equally "eye catching" hairstyles were not subject to the same treatment.

The district court referred the motion to a magistrate judge for findings of fact and conclusions of law. On October 27, 1997, the magistrate judge found that Hollins had failed to make out a *prima facie* case on either the disparate treatment or the retaliation claims, and recommended summary judgment for Atlantic. Hollins objected to the magistrate judge's recommendation and submitted supplementary affidavits from herself and Toney. The affidavits responded to specific evidentiary deficiencies identified by the magistrate judge. The district court reviewed the motion de novo, including the supplementary affidavits, and adopted the recommendation of the magistrate judge, finding Hollins's evidence insufficient to state a *prima facie* case of disparate treatment or retaliation.

## II.

We review *de novo* a district court's grant of summary judgment. *Tiemeyer v. Community Mut. Ins. Co.*, 8 F.3d 1094, 1097 (6th Cir.1993).

The standards for summary judgment are well-established:

> Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The court determines whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505,

658

658

91 L.Ed.2d 202 (1986). Of course, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant meets its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At that point, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

*Dixon v. Anderson*, 928 F.2d 212, 216 n. 5 (6th Cir.1991) (parallel citations omitted).

### III.

### DISPARATE TREATMENT

#### A.

Hollins does not present direct evidence of discrimination. In a Title VII case, in the absence of direct evidence, the burden-shifting approach for inferential proof of discrimination set forth in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. *Burns v. City of Columbus Dep't of Pub. Safety*, 91 F.3d 836, 843 (6th Cir.1996). This same analysis applies to Hollins's claims under 42 U.S.C. § 1981, 42 U.S.C. §§ 2000e–2000e–17, and OHIO REV.CODE § 4112.99. *See, e.g., Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 575 N.E.2d 1164, 1167 (1991). Because Hollins alleges racial discrimination under each provision for acts arising out of the same facts and circumstances, we will consider these claims together. *Cf. Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992).

We have described the familiar *McDonnell Douglas* analysis as follows:

> (1) the plaintiff must establish a prima facie case of racial discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual.

*Harrison v. Metropolitan Gov't of Nashville and Davidson County*, 80 F.3d 1107, 1115 (6th Cir.1996).

 Hollins alleged disparate treatment with respect to the terms and conditions of her employment. In the absence of direct evidence of discriminatory treatment, proof of discriminatory motive can be inferred from the mere fact of differences in treatment. *See Shah v. General Elec. Co.*, 816 F.2d 264, 267 (6th Cir.1987). In order to satisfy the requirements of the *prima facie* case of disparate treatment the plaintiff must produce evidence that: (1) she is a member of a protected class, and (2) for the same or similar conduct she was treated differently from similarly situated non-minority employees. *See Harrison*, 80 F.3d at 1115; *Mitchell*, 964 F.2d at 583; *Beaven v. Commonwealth of Kentucky*, 783 F.2d 672, 676 (6th Cir.1986).

 We have "frequently phrased the requirements of a *prima facie* claim of disparate treatment," *Mitchell*, 964 F.2d at 582, in the above terms. However, in *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1270 (6th Cir.1986), this court referenced a third requirement; that is, "sufficient evidence ... from which the court can find a causal connection between race ... and the alleged acts of the defendants." The *Cooper* court merely approved the district court's articulation of this third element, without citing any authority; and, without discussion of the causal connection requirement, the court remanded the case for reconsideration of

whether there were similarly situated employees treated differently from the plaintiff. As a consequence, *Cooper* has introduced some confusion into the case law in this circuit over the nature of the *prima facie* elements of the disparate treatment claim.

We are convinced that a separate "causal connection" element does not fit neatly within the *McDonnell Douglas* burden-shifting paradigm the Supreme Court has prescribed for evaluating the evidence in a disparate treatment case. The inferential method of establishing discrimination is not a " 'mechanized or ritualistic' " inquiry, but " 'is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.' " *Beaven*, 783 F.2d at 676 (citations omitted). Adding a separate causal connection requirement as an element of the *prima facie* case of disparate treatment is unnecessary because it merely restates that which the second element of the analysis already requires: evidence that non-minority employees were treated differently under the same or similar circumstances. As we noted in *Hale v. Cuyahoga County Welfare Department*, 891 F.2d 604, 606 (6th Cir.1989), "[t]he 'causal connection' step generally is met simply by showing that the position in question was awarded to a member of [an unprotected class]." Likewise, we recently stated, "Individual disparate treatment cases generally require indirect evidence from which an inference of discriminatory motive may be drawn, namely, comparative evidence demonstrating that the treatment of the plaintiff differs from that accorded otherwise similarly situated individuals who are not within the plaintiff's protected group." *Brown v. Brentwood Music, Inc.*, No. 97–5835, 1998 WL 415832, at *1 (6th Cir. June 16, 1998) (unpublished disposition).

In *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, the Supreme Court observed that "[t]he ultimate burden of persuading the trier of fact that the defendant intentional-

ly discriminated against the plaintiff remains at all times with the plaintiff" and "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." The *prima facie* case merely serves to raise a rebuttable presumption of discrimination by "eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff]," *id.* at 254, 101 S.Ct. 1089, and not to satisfy the plaintiff's ultimate burden of persuasion. Thus, we are satisfied that, in a disparate treatment case, any further inquiry into causation at the *prima facie* stage, beyond the requirement of comparative evidence, is superfluous. The ultimate question of causation is subsumed by the final stage of the burden-shifting analysis.

■ In order to prove the second element of the *prima facie* case, the plaintiff must produce evidence that the relevant other employees are "similarly situated in all respects." *Mitchell*, 964 F.2d at 583.

> The Supreme Court has noted that in comparing employment discipline decisions, "precise equivalence in culpability between employees" is not required. Rather, the plaintiff must simply show that the employees were engaged in misconduct of "comparable seriousness."

*Harrison*, 80 F.3d at 1115 (citations omitted).

■ Moreover,

> to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell*, 964 F.2d at 583 (citation omitted).

### B.

■ There is no dispute that the plaintiff belongs to a protected class. The dis-

trict court concluded that Hollins failed to make out a *prima facie* case because she premised her allegation that similarly situated employees were treated differently on the assertion that several non-protected employees violated the policy with comparable hairstyles, but she presented "no evidence that any *supervisor* . . . *determined* that a non-protected employee wore a comparable hairstyle and was not notified of being in violation of the . . . policy." (Emphasis added.) Atlantic points to our decision in *Mitchell* as support for this conclusion. We disagree.

Before discussing *Mitchell*, however, we note that the original and supplemental affidavits produced by Hollins, taken together, establish that at least five white women on Hollins's shift, working under the same supervisors, came to work repeatedly wearing the same hairstyle as that for which Atlantic reprimanded Hollins. These five white women were never reprimanded, never required to present pictures of proposed hairstyles, or otherwise required to provide notice or request approval in advance for a hairstyle change. Atlantic contends that the women were not true "comparables," because, as the district court found, the *employer* never determined that they were comparables. However, on a motion for summary judgment, the evidence presented by the nonmoving party is to be taken as true and all reasonable inferences that may be drawn therefrom are to be drawn in the nonmoving party's favor. *See Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996); *Morales v. American Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir.1995). On this basis alone, we are satisfied that the district court erred when it refused to accept the allegation of identical conduct and draw an inference of discrimination on the basis of disparate treatment.

Further, we reject the notion that our decision in *Mitchell*, 964 F.2d 577, somehow compels a different result. *Mitchell* rested on fundamentally different factual allegations that justified the conclusions that the alleged acts were not comparably serious and that the other employees were not similarly situated. There, the plaintiff, an African American who was discharged for hiding valuable company property and lying to her supervisor about its whereabouts, alleged that other non-protected employees had engaged in comparably serious misconduct involving absenteeism and insubordination. *See id.* at 583. Her only support for the assertion of comparable seriousness was her subjective belief that these acts amounted to more serious misconduct than the acts she committed. This court rejected that assertion stating, "Plaintiff's allegations regarding other employees not being fired for different, but what she subjectively believes to be more serious, misconduct simply does not satisfy that element. . . ." *Id.*

Here, however, the Hollins and Toney affidavits assert that white women wore *identical* hairstyles—*i.e.*, engaged in identical, not just comparable, conduct—but received different treatment. Moreover, the affidavits establish that the relevant employees all dealt with the same supervisors; and Atlantic's policy manual, as well as the testimony of plant supervisor Adams, establish that all Atlantic employees are subject to the same grooming standards. Despite this, Gagel testified that a separate "calls attention" grooming prohibition that is not mentioned in Atlantic's policy was formulated and applied specifically to Hollins. The evidence establishes no apparent mitigating or differentiating circumstances to distinguish Atlantic's treatment of Hollins as opposed to its treatment of the white women who wore identical hairstyles. Thus, *Mitchell* is neither controlling nor persuasive. Hollins's evidence is sufficient to raise an inference of unlawful discrimination and shift the burden to Atlantic to produce a legitimate nondiscriminatory reason for its actions. We hold, therefore, that the district court erred when it granted summary

judgment for failure to establish a *prima facie* case.

### C.

■ Atlantic has, of course, offered its grooming policy as its legitimate nondiscriminatory reason for its treatment of Hollins. Thus, the rebuttable presumption of discrimination raised by the *prima facie* case "drops from the case," *Burdine*, 450 U.S. at 255 n. 10, and all that remains is the issue whether the plaintiff has produced sufficient evidence to survive the motion for summary judgment on the ultimate question of pretext, *see Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir.1994).

### D.

■ The district court did not address the issue whether Hollins's evidence is ultimately sufficient to rebut Atlantic's defense as pretextual. However, Atlantic argued this basis for summary judgment in its motion and on appeal, and both parties addressed the issue in their briefs to this court. Thus, addressing the district court's ruling on Atlantic's motion *de novo*, we must determine whether Hollins's evidence is sufficient to create a material issue of fact as to whether Atlantic applied its grooming policy to Hollins in a discriminatory fashion.

In *Manzer*, we explained that one way a plaintiff raises a material question of fact as to the credibility of the employer's defense at the pretext stage is by " 'show[ing] by a preponderance of the evidence ... that the proffered reasons ... were *insufficient* to motivate discharge.' " *Id.* at 1084 (citation omitted). This "showing ... ordinarily[ ] consists of evidence that other [nonprotected] employees ... were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff" and that "provide[s] an evidentiary basis for ... 'a suspicion of mendacity.' " *Id.* (citation omitted).

■ Taking the Hollins and Toney affidavits as true, as indeed we must, we conclude that Hollins has raised a question of fact whether Atlantic's grooming policy—which she claims was not applied to the white women—was a pretext for its treatment of Hollins. Indeed, Gagel and Konopinski both testified that Hollins's hairstyles fit within the express language of Atlantic's policy as "neat and well groomed," but still violated a separate unwritten expression of policy, apparently developed specifically for Hollins, related to whether the styles were "eye catching" or otherwise called attention to her. Under these circumstances, a jury could reasonably infer that Atlantic applied its grooming policy to Hollins in an unlawfully discriminatory manner when it singled her out for different treatment.

### IV.

### RETALIATION

■ 42 U.S.C. § 2000e–3(a) prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" in connection with an unlawful employment practice. The *prima facie* case of retaliation requires a plaintiff to demonstrate:

> "(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his [or her] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action."

*Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 877 (6th Cir.1991) (citation omitted).

■ The parties agree that Hollins engaged in protected activity and that Atlantic, through Gagel, was aware of the protected activity. The parties principal dispute is over whether Hollins suffered an adverse employment action when Gagel allegedly threatened to discharge her and lowered her performance ratings.

We agree with the district court that the evidence that Gagel threatened to discharge Hollins is too ambiguous to satisfy the adverse employment action requirement. There is no evidence that Gagel had the authority to transfer or terminate, and the alleged threat merely stated the possibility of transfer or discharge.

■ We also agree with the district court that Hollins's lowered ratings do not establish an adverse employment action under these circumstances. In *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993), the Seventh Circuit explained the requirements for establishing a materially adverse employment action in the context of an age discrimination case:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities,˙ or other indices that might be unique to a particular situation.

■ This court adopted the *Crady* factors in *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir.1996). Although *Crady* arose under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, and, *Kocsis* addressed the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, we are satisfied that a plaintiff must identify a materially adverse change in the terms and conditions of his employment to state a claim for retaliation under Title VII.

Hollins submits that Atlantic uses a mathematical formula that charts "skill points" and "performance ratings" to arrive at a "recommended wage." She argues that the fact that she was not receiving 100% of the "recommended wage" during February and June 1997, despite her frequent raises, is an adverse employment action. The lower court concluded that the effect of the lower performance ratings was unclear, given that she received only slightly lower ratings with respect to two out of 17 possible factors.

■ Significantly, Hollins presents no evidence regarding Atlantic's policy with respect to adherence to the recommended wage, for example, whether it is mandatory or merely a factor for consideration, or whether anyone at Atlantic is actually paid the recommended wage. Hollins never received an unfavorable evaluation, and none of the cases Hollins cites establishes that lowered performance ratings, standing alone, constitute a materially adverse change in the terms and conditions of employment. The raises given Hollins in February and June 1997 represent a wage increase of more than 10 percent. Satisfactory ratings in an overall evaluation, although lower than a previous evaluation, will not constitute an adverse employment action where the employee receives a merit raise. *See, e.g., Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994). Hollins failed to establish a *prima facie* case of retaliation because she produced no evidence to show that the lowered performance ratings actually had an effect on her wages such that a court may conclude that there was a materially adverse employment action.

## V.

## CONCLUSION

We **REVERSE** the district court's decision granting summary judgment for failure to present a *prima facie* case on Hol-

lins's disparate treatment claim, and we further hold that Hollins's evidence of disparate treatment is sufficient to rebut Atlantic's proffered defense and permit a fact finder to infer unlawful discrimination. We **AFFIRM** the district court's decision granting summary judgment for failure to establish a *prima facie* case of retaliation. We **REMAND** the case to the district court for further proceedings consistent with this opinion.