Thomas E. SUTHERLAND and Nancy Karim, Plaintiffs,

v.

MICHIGAN DEPARTMENT OF TREASURY, Alfinio Olivarez, Anthony Taylor, Larry Collar, and Jane Osburn, Defendants.

No. 99–73571.

United States District Court, E.D. Michigan, Southern Division.

Jan. 22, 2001.

817

Charles J. Porter, Pending App., Clarkston, MI, for Plaintiffs.

Joseph E. Potchen, Susan Przekop–Shaw, James E. Long, Michigan Department of Attorney General, Corrections Division, Lansing, MI, for Defendants.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I. Introduction

This is a reverse race discrimination case under 42 U.S.C. § 1983 and Michigan's Elliott–Larsen Civil Rights Act, Mich.Comp.Laws § 37.2102 *et seq.* Plaintiffs Thomas E. Sutherland (Sutherland) and Nancy Karim (Karim) (collectively Plaintiffs), employees of the Audit Division of the Bureau of Revenue of defendant Michigan Department of Treasury (Treasury Department), are suing the Treasury Department, and individual defendants, Anthony Taylor, Larry Collar, and Jane Osburn, Treasury Department employees who served as the interview panel for in-

terviews held in August, 1998 (collectively the 1998 interview panel), and Alfinio Olivarez (Olivarez), the Treasury Department's equal employment officer, in their individual capacities, for unconstitutionally denying them promotions on the basis of race.[1] The background of the case is described in the Memorandum and Order of March 21, 2000, granting in part and denying in part plaintiffs' various motions.

Plaintiffs claim they each were improperly denied a promotion from Auditor 12 to Audit Manager 14 as a result of *ad hoc* affirmative action employed by the defendants Plaintiffs also claim that the Treasury Department's past affirmative action programs,[2] which involved racial and gender preferences in hiring and promotion, were unconstitutional because as of 1983, the percentages of African–American employees and female employees in the Audit Division of the Treasury Department were each proportionate to their representation in the relevant labor force.

Now before the Court is plaintiffs' motion for partial summary judgment, seeking a ruling that "Defendants' past affirmative action and current *ad hoc* informal affirmative action in the Audit Division are unconstitutional and violate the Fourteenth Amendment, 42 U.S.C. § 1983, Title VII and the Elliott–Larsen Civil Rights Act," as well as defendants' motion for summary judgment on the grounds that plaintiffs cannot demonstrate that race was a factor in deciding the 1998 promotions. For the following reasons, plaintiffs' motion for partial summary judgment will be denied, defendants' motion for sum-

1. At oral argument held on February 9, 2000, plaintiffs represented to the Court that their claims are based upon the 1998 promotions only; they are not contesting the 1997 promotions. Additionally, despite Karim's current attempt to claim both gender and race discrimination, both plaintiffs represented in their depositions that their claims are based

upon race only. As such, gender discrimination is not at issue in this case.

2. As of January 25, 1998, all formal affirmative action policies of the Treasury Department, such as the "Rule of 3," or the "Rule of 15," were discontinued.

mary judgment will be granted in part and denied in part, and plaintiffs' motion for interim award of attorney fees will be denied.

## II. Facts [3]

### A. Plaintiffs' employment history

Both plaintiffs are longtime employees of the Audit Division of the Treasury Department. Sutherland began his employment on June 8, 1969 and received regular advancement, eventually becoming an Auditor 12 in the Traverse City office of the Audit Division in December, 1984. Karim has worked in the Audit Division since January, 1984, and became an Auditor 12 in the Pontiac office in April, 1994. In May, 1996, each were appointed acting Auditor Manager 14 of their respective offices.

### B. 1998 Promotion

In August, 1998, plaintiffs interviewed for two of six open Auditor Manager 14 positions. Sutherland sought the open position in Traverse City, and Karim sought the open position in Pontiac. Each candidate for promotion was evaluated on the basis of four criteria, as judged by a three-person panel: a written exam,[4] an oral interview, overall,[5] and supervisor input. In the end, the interview panel,[6] consisting of an African–American man, a Caucasian man, and a Caucasian woman, recommended to Olivarez, candidates other than plaintiffs:[7] Braysley Famurewa (Famure-wa), an African–American man for the Traverse City position, and Rosalind Robinson (Robinson), an African–American woman, for the Pontiac position.

### C. The Competition

#### 1. Sutherland vs. Famurewa

At the time of the 1998 interviews, Famurewa had been an Auditor 11 working in the Ann Arbor office. Although it is undisputed that Famurewa received a higher interview score than Sutherland (out of a possible 900 points, Famurewa received 619.5 points and Sutherland received 604 points), Sutherland contends that his score was "deliberately lowered and Mr. Famurewa's score was deliberately skewed upwards to achieve the results." Sutherland affidavit at ¶ 14. According to Sutherland, Famurewa was not as qualified as Sutherland; as evidence of this, Sutherland says that Famurewa had sought and been denied a promotion to Auditor 12 in 1997, scored lower than Sutherland on the written mid-management examination, and had no prior management experience. Sutherland also says that since Famurewa has occupied the position of Auditor Manager 14 in Traverse City, Sutherland has observed that "[Famurewa] is unable to answer field problems, and assist auditors in the field; and I am getting calls on field problems because he is unable to do the job." Sutherland affidavit at ¶ 16.

---

**3.** The facts are difficult to glean from the record because neither party followed the Court's motion practice guidelines incorporated in the pretrial scheduling order of April 27, 2000.

**4.** The interview panel developed model answers to the written examination questions. Although plaintiffs contest that such answers were developed, they offer no evidence to support their contentions.

**5.** This included such factors as education, interpersonal skills, motivation, etc.

**6.** The interview panel was selected as follows: Audit Division Administrator David Husted selected Audit manager Taylor to chair the interview panel and Taylor selected the other panel members, Osburn, an Auditor Manager 14 in Grand Rapids, and Collar, a Department Specialist 14 in the Office of Quality Management.

**7.** For a more detailed discussion of the promotion procedures for public employees used by the Treasury Department, see the Court's Memorandum and Order of March 21, 2000.

Sutherland also proffers affidavits from Michael Steinman (Steinman) and Brenda Broughan (Broughan), who state that in their opinion, after reviewing Question One on the written examination, Sutherland gave a better answer than Famurewa.

### 2. Karim vs. Robinson

A short history regarding the Pontiac position is necessary to understand the basis of Karim's claim. On January 28, 1998, David Husted, the Audit Division Administrator, issued a memorandum noticing a vacancy for an Auditor Manager 14 position in the Pontiac office. No transfer requests were received by the deadline of February 11, 1998. Therefore, on April 17, 1998, Husted re-posted the vacancy notice for the Pontiac Auditor Manager 14 position. Robinson, after recently passing the 2 year waiting period [8] as an Auditor Manager 14 in Detroit, submitted a transfer request in response to the second posting. Robinson was granted the transfer and obtained the Pontiac position without going through an interview process.

On April 22, 1998, Karim filed a grievance over the second posting, requesting that Robinson's transfer be rescinded and that the position be opened for competitive interviews, as was the usual procedure when a vacancy was not initially filled by a transfer. Karim succeeded on her grievance; Robinson's transfer was rescinded, the position was opened for interviews. Karim did not appeal this decision. Twenty people, including both Karim and Robinson, interviewed for the Pontiac position. Robinson received the highest score; Karim scored fourth in the selection process.[9]

Unlike Sutherland, Karim does not challenge the scores assigned to any of the candidates during the selection process; she concedes that Robinson was the highest interview scorer, Rather, Karim contends that at the time of the first vacancy posting, Robinson was ineligible for a transfer to the Pontiac office, and consequently, was also ineligible to interview for the Pontiac position.

Defendants respond that as of the date of the second job posting, Robinson had served two years as Auditor Manager 14 in Detroit, and therefore was eligible for a transfer. Defendants therefore assert that interviewing Robinson for the position was entirely proper, given that it was only because of Karim's grievance that the position was opened for interviews.

### III. Summary Judgment

Summary judgement may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir.1995). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving

---

**8.** Apparently, the Audit Division had an established past practice prohibiting an employee from transferring into the same job classification position at another office locations until the employee had worked in his or her current position for at least two years.

**9.** The second and third highest scoring candidates had also applied for positions in Detroit which they elected to take over the Pontiac position. Therefore, Karim was next in line behind Robinson.

party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Nonetheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

IV. Analysis

A. Past Affirmative Action

Plaintiffs spend a great deal of time in their briefs discussing the racial and gender affirmative action policies employed by the Treasury Department over the past twenty years. Plaintiffs include in their papers considerable statistical data regarding the Treasury Department's promotion and hiring patterns and vigorously assert that "illegal racial and gender preferences have been rampant for years." Plaintiffs also say that the justification asserted by the Treasury Department for such affirmative action—societal discrimination—cannot be justified. Rather, plaintiffs say that defendants should have ceased utilizing all affirmative action devices in 1983 because as of 1983, the percentages of African–American employees and female employees in the Audit Division of the Treasury Department were each proportionate to their representation in the relevant labor force. Plaintiffs further contend that the defendants continue to illegally use *ad hoc* affirmative action in its hiring and promotions. Thus, plaintiffs

say they are entitled to partial summary judgment on this issue.[10]

However, irrespective of the constitutionality of the Treasury Department's past affirmative action policies, plaintiffs fail to demonstrate how such policies are relevant to the dispute at hand. All the proffered evidence indicates that all affirmative action programs in the Treasury Department ceased in 1998, prior to the 1998 promotions, with the elimination of augmented certification. Despite plaintiffs' arguments to the contrary, the Treasury Department's current Equal Employment Opportunity Policy is not an affirmative action plan. Rather, it simply provides that in the event the Treasury Department has evidence of present effects of past discrimination, it *may* employ a narrowly tailored race or gender based remedy.[11]

Standing to bring a claim requires that a plaintiff show the following: (1) that plaintiff suffered an injury in fact—an invasion of a legally protected interest which is concrete and particularized, (2) a causal connection between the injury and the conduct complained of, and (3) that it is likely that plaintiff's injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Here, plaintiffs have failed to show any causal relationship between affirmative action policies employed by the Treasury in the past and plaintiffs' current claims which pertain solely to the 1998 promotions. Thus, plaintiffs have no

---

10. Although styled as a motion for partial summary judgment, plaintiffs appear to be seeking a declaratory judgment stating that defendants' past affirmative action practices are unconstitutional.

11. The full text of the Treasury Department's Equal Employment Opportunity Policy regarding affirmative action reads as follows:

 **V. Affirmative Action**

Where there is evidence of the present effects of past discrimination (inadvertent or intentional), a narrowly tailored remedy may be warranted. Any such affirmative action plan must be approved in advance by the State Personnel Director, in accordance with Civil Service Rules, Regulations and applicable law, and then submitted to the Civil Rights Commission for its review and approval.

standing to seek a declaratory ruling on the issue of the constitutionality of the Treasury Department's past affirmative action programs.

Accordingly, plaintiffs' motion for partial summary judgment on the issue of the Treasury Department's past affirmative action policies is DENIED.

### B. Reverse Discrimination Claim

#### 1.

 In order to make out a prima facie case of "reverse racial discrimination" for a lost promotion, in the absence of direct evidence, a plaintiff must demonstrate: (1) background circumstances indicating that the defendant is that unusual employer who discriminates against the majority, (2) that plaintiff applied and was qualified for the position at issue, (3) that despite plaintiffs qualifications, plaintiff was rejected, and (4) that after plaintiff's rejection, the position was filled by a protected group employee. *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 (6th Cir. 1994); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 66–67 (6th Cir. 1985). This heightened standard of proof is also applicable to reverse discrimination claims under the Michigan Elliott–Larsen Civil Rights Act. *See Allen v. Comprehensive Health Servs.*, 222 Mich.App. 426, 564 N.W.2d 914 (1997).

 Here, defendants argue that plaintiffs cannot make out a prima facie case of reverse discrimination because they cannot show sufficient background circumstances to support the suspicion that defendants discriminate against caucasians. However, while the information regarding the Treasury Department's past affirmative action policies does not entitle plaintiffs to a judgment as a matter of law that all of the Treasury Department's past affirmative action policies were illegal, it does provide sufficient background circumstances to indicate that the Treasury Department may be the "unusual employer who discriminates against the majority." Accordingly, the first prong of the test is met and both plaintiffs have stated a prima facie case

#### 2.

Plaintiffs next argue that defendants, legitimate, non-discriminatory explanation for plaintiffs' rejection, *i.e.*, that the promotions were as the result of an objective interview and hiring process with no consideration of race involved, is pretextual.

#### a. Sutherland

 At the heart of Sutherland's argument that the interview process was not objective and that race was improperly interjected into his promotional consideration is his belief that he was better qualified for the position than Famurawa. Aside from his own subjective opinion that he was a better candidate, Sutherland proffers the evaluations of Broughan and Steinman as evidence that Sutherland's written examination score was deliberately downgraded to the benefit of Famurawa. Both Broughan and Steinman state that in their opinion, the answer Sutherland gave to Question 1 of the written examination warranted a higher score than what was given. *See* Steinman dep. at 22–23; Plaintiffs' answer to defendants' motion for summary judgment at 4. However, both Broughan and Steinman admit that they had no knowledge of the criteria used to grade the examination, had not seen the other candidate's answers, did not know the contents of the model answer to the question, and did not participate in the hiring process. More importantly, neither gave any indication that they believed Sutherland's score was deliberately downgraded, or that race was used to score the candidates. Accordingly, the testimony of Broughan and Steinman is insufficient to create a *genuine* issue of material fact.

Finally, Sutherland relies upon statistical data on the hiring patterns of the Trea-

sury Department in an attempt to show that "illegal racial and gender preferences have been rampant for years." However, Sutherland fails to demonstrate that the proffered data has any statistical significance, or that there is any connection between the statistics and the instant case. For example, Sutherland attaches a State of Michigan Work Force report from 1997–98 indicating that out of 19,533 employees in the Professional job category, 7,251 were white males, and 7,296 were white females.[12] At first glance, the numbers do not seem extraordinary; therefore, without some sort of statistical analysis, these numbers are meaningless. Accordingly, defendants are entitled to summary judgment on Sutherland's claim.

### b. Karim

■ Karim's claim rests upon the propriety of allowing Robinson to interview for the Pontiac position. Karim argues that allowing Robinson to interview for the Pontiac position when Robinson had not worked for more than 2 years in her current position at the time of the first transfer posting, violated established past practices such that racial discrimination can be inferred. Although the defendants explain Robinson's consideration for promotion as mandated by Karim's grievance resolution, the initial decision to re-post a transfer notice seems to have been out of the ordinary established past practices. Indeed, the grievance hearing officer investigating Karim's grievance found the re-posting to be outside of established past practices.

According to Karim, the second transfer notice, was "obviously made to invite Ms. Robinson to seek transfer just after she met the two year period. . . ." Implicit in Karim's argument is the belief that any such preferential treatment of Robinson was on account of her race. Assuming, as we must for purposes of this motion, that Robinson was given preferential treatment with the second posting, this creates a genuine issue of material fact as to whether the 24–month policy was selectively enforced on the basis of race and casts a shadow on the legitimate, non-discriminatory explanation given for allowing Robinson to interview. *See Hollins v. Atlantic Company, Inc.*, 188 F.3d 652 (6th Cir.1999) (grooming policy enforced only against black woman raises inference of discrimination). Although Karim's position appears a bit attenuated, reasonable minds could disagree on the issue of pretext, thus rendering summary judgment inappropriate at this time.

■ However, what is still unclear is how any inference of racial discrimination derived from the decision to re-post the transfer notice can be attributed to the 1998 interview panel defendants.[13] On the record as it now stands, David Husted, the Audit Division Administrator, made the decision to re-post the transfer notice and the grievance hearing administrator made the decision to allow Robinson to participate in the interview process. The 1998 interview panel simply conducted the interview procedures, the results of which Karim does not challenge. Accordingly, the 1998 interview panel defendants are entitled to summary judgment on Karim's claim.[14]

---

**12.** Since this is a race discrimination case, race is the only relevant comparable characteristic. Thus, Sutherland's statistics, which compare only white males to the rest of the workforce, are deliberately skewed.

**13.** The participation, if any, of defendant Olivarez as to Karim's claim is also unclear.

**14.** The defendants also argue that the 1998 interview panel defendants are entitled to summary judgment on the grounds of qualified immunity. This argument, however, need not be addressed given that the individual panel members are entitled to summary judgment on other grounds.

### C. Interim Attorney Fees

■ Plaintiffs' motion for an interim award of attorney fees is premature. There is no indication that plaintiffs are, or ultimately will be, the prevailing party in the case.

### V. Conclusion

For the reasons stated above, plaintiffs' motions for partial summary judgment and an award of interim attorney fees are DE-NIED. Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART; plaintiff Karim's claim for race discrimination only continues. The 1998 interview panel members are DISMISSED as defendants.