NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0517n.06
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
May 22, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| HANY G. CHOULAGH, | ) | |
| | ) | |
| Plaintiff-Appellant | ) | |
| | ) | |
| v. | ) | |
| | ) | **ON APPEAL** FROM THE UNITED |
| ERIC H. HOLDER, JR., Attorney General, | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| Defendant-Appellee | ) | |

BEFORE:   MERRITT, SUHRHEINRICH, and DONALD, Circuit Judges.

**MERRITT, Circuit Judge**.  This Title VII case involves a language analyst of Iraqi origin and allegations of discrimination and retaliation against the Federal Bureau of Investigation. Although Hany Choulagh's career with the FBI is riddled with disciplinary incidents, we find nothing in the record indicating that the discipline was either discriminatory or retaliatory in any way.  For the foregoing reasons, we affirm the district court's grant of summary judgment to the defendant employer, the FBI.

## I.  Background

### A. Testimony in EEO case

Hany Choulagh, a language analyst at the Federal Bureau of Investigation's Detroit Division, is of Iraqi national origin.  In December 2008, Michael Boyden, a white American, became

Choulagh's supervisor. Prior to Boyden's arrival at the Detroit division, another FBI employee, also of Iraqi national origin, filed an Equal Employment Opportunity complaint against a different supervisor. Choulagh received an email on March 24, 2009, indicating that he was approved to testify on behalf of the former employee.

Choulagh told Boyden he would be testifying on the morning of April 9, 2009, the date he actually testified. When asked in depositions whether he told Boyden that he was going to testify before April 9, Choulagh responded that he could not remember, but that Boyden "must have known." Choulagh also stated that he and Boyden never discussed the nature of his testimony at any time.

### B. Choulagh's Work History

With that background in mind, we turn now to the events that took place after Boyden's arrival at the Detroit division. As illustrated below, Boyden's relationship with Choulagh got off to a rocky start, beginning first with a sleeping incident. Although the incidents are numerous and detailed, we will only briefly recite the facts relevant to the legal analysis.

On March 30, 2009, Boyden saw Choulagh sleeping at his desk. Another language analyst witnessed this incident as well. Boyden then called Choulagh on the telephone at his desk, but Choulagh did not answer. Boyden then asked another analyst to call Choulagh on his cell phone. After approximately 10 rings, Choulagh awoke to answer the phone.

On April 1, 2009, Choulagh was out sick with bronchitis. On that same day, Boyden sent Choulagh an email about the sleeping incident. The email stated that Boyden witnessed Choulagh sleeping at his desk, but that the incident was minor unless it became a pattern. The email further

stated, "If you are having some difficulty (medical or personal), that you would like some time off to resolve or if there is anything else I can do, please let me know."

On April 2, 2009, Choulagh returned to work and read the email. Acting Supervisor Jean Younes and Boyden stated that upon reading the email, Choulagh became irate and demanded an apology. They stated that Choulagh said that medication may have made him drowsy, but he was not sleeping.

During this time period, Boyden received complaints from other language analysts about Choulagh's disruptive behavior and excessive telephone use. Also in early April, Boyden noticed that Choulagh began to look "unshaven, unkempt, and disheveled" and appeared stressed. Boyden discussed this physical change with his supervisor, who agreed with the observation and recommended that Boyden refer Choulagh to the Employee Assistance Program ("EAP").[1]

On April 9, 2009, after Choulagh returned from another few days of sick leave for his bronchitis, Boyden emailed him about the EAP. The email stated that its purpose was to "express my personal concern for your welfare, and to address your recent irritability, agitated demeanor and trouble with sleep." In the email, Boyden stated that he had issues with Choulagh's ability to get along with others and his complaining openly to employees regarding his interactions with Boyden. Boyden recommended that Choulagh seek counseling through EAP. On April 10, 2009, Boyden gave Choulagh a memo formally referring him to EAP, but Choulagh refused to sign the memo

---

[1]EAP is a confidential program available to help FBI employees deal with personal problems.

acknowledging receipt. Choulagh did go to EAP, but the coordinator concluded that he would not benefit from joining the program.

On May 18, 2009, Boyden claims that he again observed Choulagh sleeping at his desk. Boyden met with other supervisors and they decided that Choulagh's desk should be moved closer to Boyden's office so that he could be monitored more closely. Choulagh claims that the placement of the desk near Boyden's office is distracting because it is near a common work area where other employees congregate to talk. He complains that when he is trying to translate, Boyden often throws and bounces a rubber ball near his desk.

On May 20, 2009, Boyden told Choulagh that he was limiting him to on-site duties due to his "inappropriate and disruptive behavior and his insubordination." In late May, Boyden also sent a memo to FBI headquarters requesting approval to place Choulagh on a Performance Improvement Plan ("PIP").

Around this same time period, FBI headquarters sent an email to all language analysts regarding a one-year Temporary Duty Assignment ("TDY") to a foreign country. Choulagh sought Boyden's approval to apply for a TDY, but Boyden denied the request because of Choulagh's recent on-site restrictions.

In June, FBI headquarters approved the PIP request and Choulagh was placed on the PIP. As part of the PIP, Choulagh had to account for his daily activities and had restricted telephone use. These limitations stemmed from Boyden's observations and other complaints from language analysts of Choulagh's excessive, loud, often foul-mouthed, and disruptive telephone use, as well as extended periods of time away from his desk, unrelated to work activities.

In mid-June, Boyden heard that Choulagh had repeatedly asked another language analyst to remove a picture from his work station. The language analyst had a picture of an Egyptian soccer player named Hany Sham'un celebrating after a win, as well as a separate, unrelated picture of a monkey. Choulagh thought that the two pictures were related and referred to him. In his complaint, Choulagh alleges that he wanted the picture as evidence for his EEO complaint. Boyden and Younes met with Choulagh to discuss the issue and later emailed Choulagh stating that he was "not to remove, borrow, damage, or move" anything from another employee's desk without their permission.

In August 2009, Choulagh filed an EEO complaint alleging discrimination due to his national origin and his previous testimony for the former employee. In October 2009, an FBI quality control reviewer, in a double-blind process, rated Choulagh's translation as "Not Satisfactory." This was Choulagh's second such rating. The report stated that the translation had numerous grammatical errors, spelling mistakes, and mistranslations of significant words. In November, per FBI policy, Boyden notified Choulagh in a memo that because he had received two "not satisfactory" ratings, further quality issues might lead to the issuance of a warning performance-appraisal report.

In December 2009, Boyden prepared a memo for Choulagh's termination, detailing the above mentioned incidents, as well as continued problems with excessive telephone use and two more sleeping incidents. Boyden never submitted this memo, and Choulagh was never terminated.

In February 2010, Choulagh told Boyden he was interested in participating in a High-Value Interrogation Group (HIG)[2]. Boyden told Choulagh that he had reservations about recommending

---

[2]A HIG is an interagency team deployed worldwide at short notice when a high-value target is in custody.

him for the group because of his twenty-one sick leave requests in the last year and because it was an additional duty on top of his regular assignments. Boyden did not recommend Choulagh.

In March 2010, Boyden received additional complaints about Choulagh from other language analysts. These complaints concerned Choulagh's excessive personal telephone use and frequent absences from his desk. In response to these complaints, Boyden asked Choulagh to keep his cell phone in his desk drawer and to document his time away from his desk if the time period exceeded fifteen minutes. In April 2010, Choulagh filed a second EEO complaint alleging that the events from December 2009 to March 2010 constituted retaliation for having filed the first complaint in August 2009.

In addition to the facts recited above, Choulagh claims that during this time period Boyden also made a derogatory comment referencing his national origin. Specifically, he claims in his brief to this Court that on one occasion when a group of language analysts of Iraqi origin was gathered in the office, Boyden referred to them as a "gang of Iraqis." Affidavits and deposition testimony from Choulagh himself, however, reveal that Boyden only used the words "gang gathering" and never referenced the analysts' Iraqi origin.

In October 2010, Choulagh filed this Title VII suit alleging one count of national origin discrimination and three counts of retaliation. The defendant moved for summary judgment. The court granted the motion, finding that Choulagh had not made out a prima facie hostile work environment claim or a retaliation claim. Choulagh timely appealed.

## II.  Standard of Review

This Court reviews *de novo* a grant of summary judgment.  *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012).  Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986).  In doing so, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. Analysis

### A. Hostile Work Environment Claim

Choulagh claims that Boyden created a hostile work environment due to his Iraqi origin. Title VII forbids employers from discriminating against any individual with respect to his "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  In order to establish a prima facie case of a hostile work environment, a plaintiff must prove that (1) he is a member of a protected class, (2) he was subjected to unwelcome verbal or physical conduct related to his membership in that class, (3) the harassment was based on his membership in that class, (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment that is severe or pervasive, and (5) the employer knew or should have known

about the harassment, but failed to take any action to prevent it. *Barrett v. Whirlpool Corp.*, 556 F.3d 503, 515 (6th Cir. 2009).

Neither party disputes that Choulagh is a member of a protected class. The crucial question is whether that membership had anything to do with the alleged unwelcome conduct or harassment. We note that the facts in this case are extensive. However, the issue here turns on the absence of certain facts. Nowhere in the record can we find a reference to Choulagh's national origin. Although Choulagh now claims on appeal that Boyden referred to him and to other analysts as a "gang of Iraqis," he offers no evidence to support this contention and instead defeats his own argument with his own testimony. In his deposition, Choulagh explicitly states that Boyden never used the word "Iraqi" in connection with the alleged "gang gathering" comment. The record simply contains no evidence to support the claim that Boyden considered Choulagh's Iraqi origin when issuing disciplinary measures against him. As this Court has established, a plaintiff may recite "a litany of perceived slights and abuses," but the harassing acts are not part of the hostile work environment analysis if there is no proof that the harassment was based on national origin. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000). As the district court observed, "Plaintiff cannot create a genuine issue of material fact by ignoring the absence of any discriminatory animus in the record and constructing the prima facie case with his subjective belief that Defendant considered his national origin a material factor in issuing discipline." *Choulagh v. Holder*, No. 10-14279, 2012 WL 2891188, at *7 (E.D. Mich. July 16, 2012). Summary judgment as to the hostile work environment claim should be affirmed.

## B. Retaliation Claim

In addition to the hostile work environment claim, Choulagh alleges three counts of retaliation. Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" in connection with an unlawful employment practice. 42 U.S.C. § 2000e-3(a).

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he engaged in activity protected by Title VII; (2) the defendant knew of his exercise of his protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Barrett*, 556 F.3d at 516. Once this showing is made, the defendant must articulate a legitimate, non-retaliatory reason for its action before the burden shifts back to the plaintiff to show that the proffered reason was not its true reason, but merely a pretext for retaliation. *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010).

Choulagh's three counts of retaliation each involve separate "protected activity," so each count satisfies prongs one and two of the requirements for a prima facie retaliation claim. The first count encompasses the time period between March 24, 2009, when Choulagh received the email stating that he could testify on behalf of a former employee, and April 9, 2009, when he actually testified. The protected activity is therefore his agreement to testify. The alleged retaliation is the confrontation regarding the sleeping incident and the memo referring Choulagh to the EAP.

The second count is based on the protected activity of testifying for the former employee and the retaliatory conduct includes the second alleged sleeping incident, the desk move, duty restriction, the PIP, and the non-satisfactory work review.

For the last count, Choulagh alleges that he was retaliated against for filing his August 2009 EEO complaint. Thus, the complaint is the protected activity and the alleged retaliation is the termination memo, declining to refer him to the High-Value Interrogation Group and Temporary Duty Assignment, and counseling him about his excessive personal telephone use and frequent absences from his desk.

In addition to satisfying the first two prongs, Choulagh must prove that an adverse action occurred or that he was subjected to severe or pervasive retaliatory harassment and that there was a causal link between the protected expression and the adverse action or harassment.

First, Choulagh cannot prove that he was subjected to severe or pervasive retaliatory harassment. In order to establish severe or pervasive retaliatory harassment, both an objective and subjective test must be met: the conduct must be severe and pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Here, Choulagh cannot meet the objective test. A reasonable person would not find the disciplinary actions severe or pervasive, especially in light of the fact that Choulagh has not put forth any evidence refuting his falling asleep at work, his inability to get along with other coworkers, his irate exchanges with his superiors, his excessive telephone use, or his poor quality control ratings.

In fact, a reasonable jury could not find that the disciplinary actions were unjustified in light of Choulagh's workplace behavior.

Choulagh similarly fails to prove any adverse action occurred. In *Hollins v. Atlantic Co.*, 188 F.3d 652 (6th Cir. 2009), we stated that in order to establish a materially adverse employment action, the change must be "more disruptive that a mere inconvenience or alteration of job responsibilities." In *Hollins*, we listed a series of actions that may be considered a materially adverse change, including termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities. *Id.*

Here, the alleged actions are *de minimus* at best and none constitute a materially adverse action. None of the alleged retaliatory acts alleged resulted in a decrease in salary, a less distinguished title, or a loss of benefits. The placement on the performance improvement plan and the non-satisfactory work reviews had legitimate, non-retaliatory motivations and do not rise to the level of a materially adverse action. *See Agnew v. BASF Corp.*, 286 F.3d 307 (6th Cir. 2002) (holding that an employer's requirement that an employee comply with a "performance improvment plan" or face disciplinary action did not constitute adverse employment action); *Hollins*, 188 F.3d at 662 (holding that lowered ratings in a performance evaluation did not constitute an adverse employment action where there was no evidence showing an effect on wages). Even the on-site restrictions, which Choulagh alleges affect his ability for promotions are temporary restrictions with only a hypothetical possibility of an impact on wages and benefits. *See Kocsis v. Multi-care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996).

Further, Choulagh cannot prove causal connection because nothing in the record links the protected activity to the subsequent discipline, with the exception of temporal proximity. A prima facie case of retaliation cannot be based on temporal proximity alone. *Spengler v. Worthington Cyclinders*, 615 F.3d 481, 494 (6th Cir. 2010). Even the temporal proximity, as the district court points out, is attenuated because many of the disciplinary incidents took place weeks if not months after the "protected activity." *Choulagh*, 2012 WL 2891188, at *8.

Moreover, Choulagh offers no response to the defendant's legitimate, non-retaliatory reasons for discipline. The district court concluded, "The record clearly sets forth Defendant's rationale behind its disciplinary decisions. Plaintiff has no evidence that these reasons are pretextual." *Id*. at *10. Choulagh's retaliation claims fail. We agree with the district court's grant of summary judgment for the defendant.

## IV. Conclusion

Choulagh cannot make out a prima facie case of a hostile work environment without even a reference to his national origin. He also cannot prove retaliation in the absence of severe or pervasive harassment, an adverse employment action, or a causal connection. Furthermore, Choulagh's alleged actions in the workplace provide legitimate, non-discriminatory, and non-retaliatory reasons for the disciplinary actions against him. Accordingly, the judgment of the district court is affirmed.