NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a1028n.06

No. 12-4496

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| | ) | |
| **TAMMY RUSSELL,** | ) | **FILED**<br>Dec 13, 2013<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | **ON APPEAL FROM THE** |
| v. | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE SOUTHERN** |
| **JACOB LEW, in his official capacity as** | ) | **DISTRICT OF OHIO** |
| **Secretary of the Treasury,** | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: MERRITT, GIBBONS, and MCKEAGUE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Tammy Russell appeals from the magistrate judge's dismissal of her discrimination and retaliation claims. Russell, an Internal Revenue Service (IRS) employee, argues that her employer[1] violated the Rehabilitation Act by discriminating against her because of her relationship to her disabled son. Proceeding by the consent of the parties, the magistrate judge granted summary judgment for the IRS on all claims. We agree that no issue of material fact exists and therefore affirm the judgment.

---

[1]The original defendant in this case was Timothy Geithner, who was the U.S. Secretary of the Treasury when the case was filed. Jacob Lew, who is the current U.S. Secretary of the Treasury, has been substituted as the defendant pursuant to Fed. R. Civ. P. 25(d).

1

**I.**

Tammy Russell began working for the U.S. Department of the Treasury in November 2000 as a Contact Representative for the IRS in Nashville, Tennessee. While she was working at the Nashville office, Russell's son, Dillon, began to have behavioral problems. He was later diagnosed with high functioning autism and/or Asperger's Syndrome. Because of Dillon's disability, Russell transferred to the IRS office in Covington, Kentucky, in 2002 so she could be closer to her family and have easier access to medical care. During her three years in Covington, Russell periodically submitted requests for intermittent leave under the Family Medical and Leave Act (FMLA) to care for Dillon, which were approved. Russell was also promoted and received positive performance evaluations.

In the spring of 2005, Russell transferred to the IRS office in Columbus, Ohio to accept a position as a Revenue Officer. The position required Russell to complete a one-year training program. Her immediate supervisor in Columbus was Paul Meyer. Her second-in-line supervisor (Meyer's supervisor) was Anita Van Order.

Russell's first few months in Columbus were uneventful. According to Russell, Meyer first discriminated against her in August 2005 when he denied her request for FMLA leave. Russell asked to be excused from a day of training in order to attend Dillon's school orientation. In an e-mail about the request, Meyer reminded Russell that all new Revenue Officers were required to attend training and were not allowed to miss class for any reason. Russell did not take leave.

The IRS argues that Meyer was following the IRS/Small Business/Self-Employed Business Unit Collection's policy regarding leave use. According to the relevant policies, trainees in the one-year training program are only allowed to take annual leave and miss classroom training in "rare

2

circumstances," such as a personal emergency. Consistent with this policy, Meyer approved several of Russell's other leave requests during her one-year training period. And Russell admits she was never denied leave in emergencies.

Russell's performance evaluations show that she performed well throughout the fall of 2005. In Russell's annual performance review, Meyer rated Russell's performance as "fully successful" in all critical areas for the period of November 2004 to October 2005. By December 2005, however, Meyer began having concerns about Russell's performance. He completed a Case Review, in which he noted that Russell "need[ed] to make immediate improvement" and that Russell had "significant[ly] decline[d] in work performance." Russell claims she never received this review and alleges that the IRS fabricated it for the purposes of the lawsuit. But she admits that Meyer explicitly mentioned his concern with her time off in a conversation he had with her in December. During this conversation, Russell asked for permission to work credit hours to compensate for the missed time. Meyer initially told Russell that he would approve her request for credit hours, but he later retracted his approval because Russell was not allowed to work credit hours as a trainee according to IRS policy.

Meyer addressed Russell's poor performance three more times in writing before completing a Formal Case Review on March 3, 2006. In this review, Meyer notified Russell that she would not be receiving a promotion because she was not performing at a fully successful level. The Case Review indicated that Russell would be placed on a performance plan within the next 30 days. Russell testified that she was "shocked" by the review. She later signed the Case Review and submitted a written rebuttal. In the rebuttal, Russell admitted that her work had lapsed because she had taken time off to care for her son and to deal with several other personal issues. Russell also

3

attributed her poor work performance to the fact that she was not allowed additional credit hours to catch up on her cases.

Believing that Meyer had discriminated against her by withholding her promotion, Russell submitted a complaint to the agency's Equal Employment Opportunity ("EEO") office on April 13, 2006. Russell, Meyer, and Van Order met about the EEO complaint a short time later. Russell claims that during this meeting, Van Order repeatedly referred to Russell's "issues," which Russell understood to mean her need to care for Dillon. According to Russell, Van Order also said that "someone with [Russell's] issues should find another job." Van Order testified that she was simply concerned about Russell's stress levels in her personal life, including her autistic son, the death of a parent, and a bad car accident. The parties did not reach an agreement, and Russell filed a formal EEO complaint on August 15, 2006.

Russell claims she was "the target of harassment" after she initiated EEO proceedings. For example, Russell points to an e-mail from Meyer, in which he forwarded a recent decision in favor of the IRS on an FMLA claim to all members of his staff. Russell alleges that Meyer's secretary changed Russell's time sheets, refused to supply Russell with office supplies, and accessed Russell's confidential taxpayer data base without authorization.

Meyer also asked Russell to obtain a medical certification to support her requests for FMLA leave. Before May 12, 2006, Russell's FMLA requests had been approved without medical certification. Russell argues that this is evidence of Meyer's retaliation after she filed EEO charges. The IRS contends that its policies require an employee to obtain certification from a healthcare provider that a serious health condition and/or a disability exists and to provide that certification to either the employee's manager or the Federal Occupational Health unit for consideration. Further,

4

the IRS claims that its management did not become aware of the paperwork issue until May 2006 because officials believed that Russell had completed the proper forms at her previous positions.

Also in May 2006, Meyer formally placed Russell on a 60-day performance plan. Russell's performance began to improve as early as June 5, 2006, and Meyer released Russell from the plan a month later. In the letter notifying Russell of her release, Meyer remarked,

> Your performance, of course, must continue to be acceptable. In accordance with Office of Personnel Management Regulations, if your performance again becomes unacceptable before May 8, 2007, I may recommend your removal or reduction in grade without affording you an additional opportunity to improve your performance.

Meyer promoted Russell to the GS-9 level. Russell continued to perform well through the fall of 2006, at which time Jacqueline Stokes, acting in a temporary capacity, rated Russell's performance as "fully successful."

But Russell's performance declined again in December 2006. Stokes, as Acting Group Manager for Meyer, conducted a review of Russell's cases. The review showed that Russell needed immediate improvement in two areas because she was "failing in multiple aspects." The review also noted that Russell had failed to take timely action on fourteen out of fifteen cases. In discussing the review, Meyer wrote an e-mail to Dobson Narkittia, an employee in the IRS's HR office, about Russell. In the e-mail, Meyer commented, "[t]his looks like we are retaliating from her EEO and Grievance but [Stokes] was not a part of that. It is good that another manager was able to do a review." Russell contends that this review is "suspect" because it includes several cases that had been closed by the time of the review. Russell filed a rebuttal noting this issue. In the rebuttal, she also admitted that she was not devoting enough time to her cases because she was dealing with FMLA issues.

5

Meyer wrote Russell another memorandum about her performance roughly a month later. Meyer noted that he still had serious concerns with Russell's performance and that the next step would be to move forward with a recommendation of dismissal. Russell responded and acknowledged the fact that the time she spent on FMLA requests caused delays in her case management. Russell again asked for more credit hours to maintain her inventory in light of her need for time off to care for Dillon.

On May 11, 2007, Van Order recommended that Russell be terminated. Russell objected, and her termination was put on hold pending review and final decision from Van Order's supervisor. After the termination notice was issued, Russell's automatic within-grade pay raise was withheld and her promotion to GS-11 was denied twice. The IRS rejected Russell's second application to GS-11 because an insufficient number of candidates had applied. Alleging that other single-applicant candidates had received promotions in the past, Russell "infers" she was not promoted due to the pending termination action. Russell also argues that Meyer and Van Order worked together with other staff members to damage her reputation while termination proceedings were ongoing. While the proposal was pending, Van Order e-mailed with Russell about a dress code violation. And, around the time of the rebuttal presentation, Meyer's secretary called the EEO officer handling Russell's charges and reported that Russell had bought her son a gun.

The Director of the Collection Central Area rejected Van Order's termination proposal on February 26, 2008. The Director found that Van Order's termination proposal was supported by Russell's unacceptable performance; however, the Director decided not to take action in light of other mitigating factors. Four months later, Russell received a "fully successful" ranking and her within-grade pay raise.

6

In 2009, as part of an investigation into Meyer's secretary's unauthorized access to Russell's confidential information, Meyer and Van Order submitted affidavits in support of the secretary. Both affidavits referenced Russell. Meyer attested that "Russell either filed or threatened to file numerous grievances, E.E.O. complaints, and threatened employees with filing personal law suits." He went on to say that "[t]his employee [Russell] created a hostile work environment which was recognized by most employees in the office and all levels of management." Similarly, Van Order stated that "[a]lthough [Russell] was never actually denied use of time for her son's needs she became very assertive . . . almost obsessive and paranoid." Van Order also stated that Russell was very vocal about her EEO case, which upset other employees. Russell contends that these affidavits demonstrate Van Order's and Meyer's discriminatory animus and retaliatory motives toward Russell.

Russell filed this action on October 29, 2009, asserting violations of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and the Rehabilitation Act. After the district court dismissed Russell's ADA and FMLA claims, the IRS moved for summary judgment on Russell's remaining claims for associational discrimination, retaliation, and hostile work environment under Section 501 of the Rehabilitation Act. Proceeding by consent of the parties, the magistrate judge granted the IRS's motion in its entirety. Russell appealed, challenging the magistrate judge's decision as to her claims of discrimination and retaliation.

**II.**

We review a magistrate judge's decision to grant summary judgment *de novo*. *Crocker v. Runyon*, 207 F.3d 314, 318 (6th Cir. 2000). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

7

matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In deciding motions for summary judgment, we draw all reasonable inferences in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

### III.

Russell brings this action under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–797(b), which provides the exclusive remedy for federal employees alleging disability discrimination. *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004). In evaluating claims brought under the Rehabilitation Act, we generally apply the same standards that govern claims brought under the ADA. *See* 29 U.S.C. § 791(g) (2009); *Andrews v. State of Ohio*, 104 F.3d 803, 807 (6th Cir. 1997).

### A.

Russell alleges that the IRS discriminated against her because of her relationship with Dillon. We have recognized in another unpublished opinion that associational discrimination claims are viable under the Rehabilitation Act. *See Popovich v. Cuyahoga Cnty. Court of Common Pleas, Domestic Relations Div.*, 150 F. App'x 424, 427 (6th Cir. 2005). This case does not require us to explore the issue further.

We analyze Russell's claim through a burden-shifting test similar to the one set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). Russell must demonstrate the

following elements to establish a *prima facie* case of associational discrimination under the Rehabilitation Act: (1) she was qualified for the position; (2) she was subject to an adverse employment action; (3) she was known to be associated with a disabled individual; and (4) the adverse employment action occurred under circumstances that raised a reasonable inference that the disability of the relative was a determining factor in the IRS's decision. *See Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011). If Russell can establish a *prima facie* case, then the IRS must articulate a legitimate nondiscriminatory reason for the adverse action. *See id.* at 488; *see also Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). The burden then shifts back to Russell to prove that the reasons offered by the IRS were pretextual. *See Stansberry*, 651 F.3d at 488; *see also Upshaw*, 576 F.3d at 584.

Assuming that Russell may assert a claim of associational discrimination, we will also assume that Russell has established a *prima facie* case of associational discrimination.

In response, the IRS has offered legitimate, nondiscriminatory reasons for the four alleged adverse employment actions. The IRS contends that it was following neutral IRS policies when it denied Russell's 2005 request for FMLA leave and her requests to work credit hours. Russell concedes that this is a legitimate business justification. *See Blackshear v. Interstate Brands Corp*., 495 F. App'x 613, 618 (6th Cir. 2012) (finding that employer had presented a legitimate, nondiscriminatory reason when it terminated an employee according to company policy); *Hollins v. Atl. Co.*, 188 F.3d 652, 661 (6th Cir. 1999) ("[Employer] has, of course, offered its grooming policy as its legitimate nondiscriminatory reason for its treatment of [employee]."). Further, Russell's poor performance is a legitimate, nondiscriminatory reason for the 2006 failure to promote and the 2007 termination proposal. Russell argues that these actions technically violated union

9

policy because Russell's most recent annual performance evaluation reflected she was "fully successful." It is not evident from the record before us that the IRS violated any policy. But, even if Russell is correct, the IRS has produced sufficient evidence to meet its low burden of production. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256–57 (1981). Although adherence to internal policies is one example of a legitimate, nondiscriminatory reason, it is not the only one. At this point in the *McDonnell-Douglas* framework, we simply require that the *reason* for the action be legitimate. *See Stansberry*, 651 F.3d at 488.

We now turn to the issue of pretext, which provides a ready path for resolution of the case. *See Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 935 (6th Cir. 2000). Russell has offered no evidence to show that the IRS's reasons were pretextual. In order to establish pretext, Russell must demonstrate that the legitimate nondiscriminatory reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Burks v. Yellow Transp., Inc.*, 258 F. App'x 867, 874 (6th Cir. 2008) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Here, Russell does not point to any evidence suggesting that the IRS's denials of her requests for FMLA and credit hours were prextual. Instead, she focuses on her performance.

Russell argues that Meyer's denial of her promotion and Van Order's termination proposal violated union policies. But, even taking Russell's arguments as true, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 117 (6th Cor. 2001)). In determining

10

whether IRS officials had an "honest belief" in their proffered reason, we look to whether the supervisors reasonably relied on particularized facts available to the company and whether they made a "reasonably informed and considered decision." *See id.* at 502–503. At the time Meyer denied Russell's promotion, he had one negative case review, one negative memoranda, and two negative workload reviews before him. And at the time Van Order recommended Russell's termination, she had the same reviews as well as two additional negative case reviews and two more negative memoranda. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) ("[H]ere, the evidence [the employer] had at hand when it fired [plaintiff] . . . indicated that [plaintiff]'s work was not up to par."). The fact that previous supervisors had never personally experienced problems with Russell in other positions does not negate Meyer's and Van Order's belief that Russell was performing poorly. Likewise, the fact that some of the case reviews involved a subjective component is not sufficient evidence of pretext. *See Manning v. Chevron Chem. Co.*, 332 F.3d 874, 882 (5th Cir. 2003). Other than her own speculation and conjecture, Russell has not provided evidence that these evaluations were false and thus a result of discriminatory animus.

Russell even acknowledged that she was distracted at work in her rebuttals. On appeal, Russell argues that, when viewed in context, her rebuttals show that she did not believe her performance to be deficient. We disagree. Russell used her rebuttals to provide reasons as to why her performance was suffering, not to rebut her supervisors' claims that her quality of work was poor. For example, Russell claimed that her work was lacking because she was denied the use of credit hours to catch up. However, Russell was not entitled to reasonable accommodation on account of Dillon's disability. *See Stansberry*, 651 F.3d at 486. Furthermore, the fact that the supervisors would not allow Russell to adopt a modified working schedule does not demonstrate that

11

Russell's regular-hours performance was satisfactory. Russell must do more than provide explanations for her performance, she must show that the IRS's proffered reason "has no basis in fact." *See Burks*, 258 F. App'x at 874. She has not done so.

Russell last points to comments made at the 2006 meeting and in the 2009 affidavits as evidence that her poor performance did not actually motivate Meyer and Van Order. These statements do not give rise to an associational discrimination claim. Even if true, the 2006 statements focus on Russell's requests for modified work schedules and time off, not on the fact that she had a disabled son. Likewise, the declarations in the affidavits do not support the inference that the supervisors acted out of discriminatory animus toward Russell; they merely reflect Meyer's and Van Order's view that Russell had a negative attitude at work. In sum, Russell has not offered anything to show that the IRS was motivated by Dillon's disability rather than Russell's poor performance. Like in *Stansberry*, "the only connection is that [the disability] possibly caused her performance to slip." *See Stansberry*, 651 F.3d at 489. This is not an actionable claim. *See id.* at 486.

**B.**

We also apply the *McDonnell-Douglas* test to Russell's retaliation claim. *See Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). First, Russell must set forth a *prima facie* case of retaliation, which has four elements: (1) Russell engaged in a legally protected activity; (2) the IRS knew about Russell's exercise of this right; (3) the IRS then took an employment action adverse to Russell; and (4) the protected activity and the adverse employment action are causally connected. *Id.* If Russell carries this burden, the burden shifts to the IRS to "'articulate some legitimate, nondiscriminatory reason'" for its actions. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802).

12

Then, Russell must prove by a preponderance of the evidence that the reasons offered by the IRS are actually pretextual. *Id.* As in the discrimination context, we do not need to address Russell's *prima facie* case because Russell's claim fails on pretext. *See Martin*, 209 F.3d at 935.

Russell argues that she suffered two adverse employment actions in the context of her retaliation claim: Van Order's proposal that she be terminated and Meyer's request that she provide medical certification to support her requests for FMLA leave.[2] As discussed above, by pointing to Russell's performance deficiencies, the IRS has met its burden to articulate a legitimate nondiscriminatory reason for its termination proposal. Regarding Meyer's request for certification, the IRS has offered the legitimate nondiscriminatory reason that it was following neutral policies, which Russell concedes.

The only evidence in the record supporting Russell's position that her supervisors retaliated against her because of her EEO complaint are the 2009 affidavits and Meyer's email to Narkittia. But, as pointed out by the IRS and recognized by the magistrate judge, the affidavits mention Russell as one of many factors that contributed to a tense and negative work environment. Furthermore, the affidavits largely focus on Russell's alleged hostility, aggressiveness, and obsessive attitude over her FMLA requests and performance issues. The slight, tangential mention of Russell's EEO activity in the context of an affidavit about a secretary's workload is not sufficient to show pretext. Likewise, Meyer's e-mail merely acknowledges that Russell's poor performance

---

[2]Russell also argues that she suffered a retaliatory hostile work environment. However, Russell concedes that the IRS's actions in this case do not rise to the level of "severe or pervasive harassment." Therefore, the alleged harassment does not constitute an adverse employment action in the context of a retaliation claim. *See Choulagh v. Holder*, No. 12-1957, 2013 WL 2249459, at *5 (6th Cir. 2013); *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 707 (6th Cir. 2012); *see also Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). We find any additional analysis regarding these actions unnecessary.

reviews *could* look like retaliatory conduct, not that they were. Russell has not offered anything to show that the IRS was actually motivated by her EEO action rather than her poor performance.

Similarly, Russell has failed to show that the IRS's stated reason for requesting FMLA certification was pretextual. Other than the fact that Meyer had not previously asked for medical certification and the fact that the request came shortly after the EEO charges, Russell has not offered any other evidence that the IRS's request for certification was actually motivated by retaliatory animus and not the IRS's facially neutral policy. "[T]emporal proximity, standing alone, is not sufficient evidence of pretext." *Thompson v. Ameritech Adver. Servs.*, 40 F. App'x 90, 93 (6th Cir. 2002). The record shows—and Russell does not contradict—that Meyer was operating under the assumption that Russell had already filled out the proper documentation in her file. Once he found out otherwise, he requested certification. Yet he continued working with Russell to allow her to take other forms of leave and to later increase her FMLA allotment. On this record, no reasonable jury could find that it was more likely than not that the IRS's reliance on internal policy was a pretext for retaliatory motive.

**IV.**

For these reasons, we affirm the magistrate judge's decision.

14